**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**Camden Division**

| | |
|---|---|
| SUBARU OF AMERICA, INC, and GREAT AMERICAN INSURANCE COMPANY, | ) ) ) ) ) |
| *Plaintiffs*, | ) ) |
| *v.* | ) **Case No.:** _____ ) |
| CB RICHARD ELLIS, INC., | ) ) |
| *Defendant*. | ) ) ) |

## COMPLAINT

Subaru of America, Inc. ("Subaru") and Great American Insurance Company ("Great American"), by counsel, set forth their complaint against Defendant CB Richard Ellis, Inc. ("CBRE"), as follows:

### PARTIES

1.      Subaru is a New Jersey corporation incorporated under the laws of the State of New Jersey and maintains its principal place of business in Camden, New Jersey.

2.      Great American is an Ohio corporation incorporated under the laws of the State of Ohio and maintains its principal place of business in Cincinnati, Ohio.  Great American is in the business of issuing insurance contracts.

3.      CBRE is a corporation incorporated under the laws of the State of Delaware and maintains its principal place of business in Los Angeles, California.

**JURISDICTION AND VENUE**

4.      Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1332 as the controversy arises between citizens of different states and the amount in controversy exceeds $75,000.

5.      Venue is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions on which the claim herein is based occurred in the District of New Jersey.

**FACTS**

6.      This suit is brought in connection with facilities management services performed by CBRE and its subcontractor, Allied Materials, Inc. ("Allied Materials"), at several facilities used by Subaru in New Jersey.

7.      On or about May 3, 1996, Subaru entered into a Facilities Management Agreement ("the Agreement") with Trammell Crow NE, Inc., and agreed to pay for facilities management services performed at several Subaru facilities in New Jersey.  CBRE acquired Trammell Crow NE, Inc. in 2006.  A copy of the Agreement is attached as **Exhibit 1**.

8.      The Agreement specified that unless earlier terminated, it would continue until December 31, 1998 and renew automatically on a year to year basis.  *See* Ex. 1, at 1.

9.      On several occasions between 1996 and 2019, Subaru, Trammel Crow and CBRE agreed to modifications of the Agreement, including extensions of the term of the Agreement and increases in facilities management fees.

10.     From the inception of the Agreement through the end of 2018, Subaru paid Trammel Crow and CBRE approximately $8,000,000.

11.     As described in the Agreement, CBRE was to provide daily maintenance and repairs for Subaru's facilities.  *See* Ex. 1, at 2.  Among other things, CBRE agreed to manage the provision of janitorial services and supplies to Subaru's facilities.  *Id*. at 3.

12.     The Agreement provided that CBRE would review and approve all invoices relating to the operation of Subaru's facilities.  *Id*. at 6, 19.

13.     Under the Agreement, all direct and third party expenses incurred in the performance of the facilities management services were to be paid by Subaru directly.  *Id*. at 6, 21.

14.     Beginning in or about January 2003 and continuing until February 2018, CBRE, through its facilities managers, engaged in a scheme to issue false invoices from its subcontractor, Allied Materials, which were submitted to Subaru for payment.

15.     Allied Materials was a janitorial supplies company located in Berlin, New Jersey.

16.     CBRE hired Allied Materials to provide janitorial and facilities products to Subaru's facilities.

17.     Allied Materials billed Subaru for janitorial and facilities supplies such as light bulbs, which Allied Materials never delivered to Subaru's facilities.

18.     Two of CBRE's facilities managers were aware of and participated in the false invoice scheme with Allied Materials in return for cash and other consideration.

19.     Bill Norton ("Norton"), CBRE's facilities manager, was aware of and participated in the false invoice scheme in exchange for cash and other consideration from the owner of Allied Materials, Mitchell Bleicher ("Bleicher").

20.     Steven Hitzel ("Hitzel"), the facilities manager for CBRE who replaced Norton in 2011, participated in the invoice scheme by signing the false invoices.  In exchange, Hitzel

received expensive dinners, lunches and wine, as well as tickets to professional sporting events, from Bleicher.

21.     The scheme involved Allied Materials' weekly invoicing of janitorial products that were not delivered to Subaru's facilities.

22.     As a result of the false invoice scheme, Subaru lost approximately $9,700,000.

23.     Great American issued an insurance policy to Subaru.

24.     In November 2018, Subaru provided Great American with a proof of loss relating to its claim.

25.     Thereafter, Great American paid Subaru $4,750,000 for the claim.

**COUNT I**
**(Breach of Contract)**

26.     Plaintiffs incorporate by reference the foregoing allegations.

27.     The Agreement between Subaru and CBRE is a valid and enforceable contract.

28.     Subaru performed all of its obligations under the Agreement with CBRE.

29.     CBRE breached the Agreement as set forth in the foregoing allegations.

30.     Plaintiffs have been damaged as a result of the failure by CBRE to provide facilities management services according to the terms of the Agreement in an amount of not less than $9,700,000.

**COUNT II**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

31.     Plaintiffs incorporate by reference the foregoing allegations.

32.     A covenant of good faith and fair dealing is implied in every contract under New Jersey law.

33.     Upon information and belief, CBRE, through its facilities managers, acted in bad faith by participating in the false invoice scheme.

34.     CBRE's breach of the covenant of good faith and fair dealing has proximately and directly caused damages to Plaintiffs in an amount of not less than $9,700,000.

**COUNT III**
**(Fraud)**

35.     Plaintiffs incorporate by reference the foregoing allegations.

36.     CBRE received false invoices from Allied Materials.

37.     CBRE, through Norton and Hitzel, knew that the invoices it received from Allied Materials were false.

38.     CBRE signed the false invoices indicating they were to be paid.

39.     CBRE submitted the false invoices to Subaru with the intent that Subaru would pay the false invoices.

40.     Subaru paid the false invoices.

41.     As a direct result of CBRE's fraudulent conduct, Plaintiffs have been damaged in an amount not less than $9,700,000.

42.     Plaintiffs are entitled to punitive damages for the willful, reckless, wanton and fraudulent conduct of CBRE.

**COUNT IV**
**(Negligent Misrepresentation)**

43.     Plaintiffs incorporate by reference the foregoing allegations.

44.     As an alternative to Count III, CBRE is liable for negligent misrepresentation.

45.     CBRE received false invoices from Allied Materials.

5

46.     CBRE failed to disclose and/or allowed the false invoices to be submitted to Subaru.

47.     Subaru was the foreseeable recipient of the false invoices because Allied Materials was providing services to Subaru as a subcontractor for CBRE, Subaru's facilities manager.

48.     Subaru paid the false invoices.

49.     As a result of the foregoing conduct, Plaintiffs have been damaged in an amount not less than $9,700,000.

**COUNT V**
**(Contribution/Indemnification)**

50.     Plaintiffs incorporate by reference the foregoing allegations.

51.     Great American sustained damages in paying Subaru's claim.

52.     The damages sustained by Great American in paying Subaru's claim resulted from the breach of the Agreement and fraud by CBRE, and the responsibility is, therefore, upon CBRE.

53.     CBRE was the primary, direct, and contributory cause of any and all damages or losses sustained by Great American.

54.     As a result of the above, Great American is entitled to be indemnified by CBRE.

**COUNT VI**
**(Subrogation)**

55.     Plaintiffs incorporate by reference the foregoing allegations.

56.     Great American has a right of subrogation because it paid $4,750,000 to Subaru for Subaru's claim.

57.     Great American is entitled to recover against CBRE in the amount of $4,750,000.

**WHEREFORE**, Plaintiffs respectfully request judgment against CBRE for damages in an amount that is no less than $9,700,000, punitive damages, attorney's fees and costs, and for such other and further relief as the Court deems just and proper.

Dated this 10th day of July, 2020.

Respectfully submitted,

/s/ Anita J. Murray, Esquire
Eckert Seamans Cherin & Mellott, LLC
Anita J. Murray, Esquire
Attorney ID. No. 017131999
Two Liberty Place
50 S. 16th Street, 22nd Floor
Philadelphia, PA 19102
(215) 851-8395 phone / (215) 851-8383 fax
amurray@eckertseamans.com

F. Joseph Nealon [*pro hac vice* anticipated]
ECKERT SEAMANS CHERIN & MELLOTT, LLC
1717 Pennsylvania Avenue, NW
Suite 1200
Washington, DC 20006
(202) 659-6606
(202) 659-6699 [Fax]
jnealon@eckertseamans.com

Michael A. Graziano [*pro hac vice* anticipated]
ECKERT SEAMANS CHERIN & MELLOTT, LLC
1717 Pennsylvania Avenue, NW
Suite 1200
Washington, DC 20006
(202) 659-6671
(202) 659-6699 [Fax]
mgraziano@eckertseamans.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**Camden Division**

| | |
|---|---|
| SUBARU OF AMERICA, INC, and GREAT AMERICAN INSURANCE COMPANY, )<br><br>*Plaintiffs*, )<br><br>*v.* )<br><br>CB RICHARD ELLIS, INC., )<br><br>*Defendant*. ) | **Case No.:** _____ |

**<u>Local Civil Rule 11.2 Certification</u>**

Pursuant to Local Civil Rule 11.2, I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of another action pending in any court or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: 7/10/2020 _____                    /s/ Anita J. Murray _____
                                                 Anita J. Murray, Esquire

Exhibit 1

## FACILITY MANAGEMENT AGREEMENT

THIS AGREEMENT is made the 3ʳᵈ day of May, 1996
between **TRAMMELL CROW NE, INC.**, a Delaware corporation
("Manager") and **SUBARU OF AMERICA, INC.**, a New Jersey corporation
("Company").

### BACKGROUND

A.    Company is the occupant of certain real property
located in Cherry Hill, N.J., Pennsauken, N.J. and Moorestown,
N.J., as more particularly described in Exhibit "A" attached
hereto and made a part thereof (the "Managed Property").

B.    Company and Manager intend by this Agreement to
set forth in writing the terms and conditions under which Manager
shall provide facility management services for the Managed
Property.

### TERMS AND CONDITIONS

In consideration of the mutual covenants hereinafter
set forth, Company and Manager agree as follows:

1.    <u>Appointment</u>.  Company hereby confirms Manager's
appointment, as an independent contractor but not an employee, to
perform facility management services for the Managed Property
pursuant to the terms of this Agreement.  Manager hereby confirms
its acceptance of such appointment and agrees to use diligent
efforts in the management and operation of the Managed Property
in accordance with the terms of this Agreement.  The facility
management services to be performed by Manager shall be
hereinafter collectively referred to as "Services".

2.    <u>Term of Agreement</u>.

(a)  The effective date of this Agreement (the
"Effective Date") shall be May 4, 1996.

(b)  Unless earlier terminated, as herein
provided, this Agreement will continue until December 31, 1998
and renew automatically on a year to year basis.

CONFIDENTIAL

SOA 000053

(c)   Either Company or Manager may terminate this Agreement effective as of the expiration of the original term or any renewal term, for any reason, upon ninety (90) days prior written notice to the other.

(d)   Company may terminate this Agreement upon not less than thirty (30) days prior written notice to Manager in the event the cost savings achieved by Manager in any Measurement Period are less than the Penalty Threshold for that Measurement Period, as those terms are defined in subsection 5(d) hereof. Company must exercise this termination option for below-Penalty Threshold performance with respect to any Measurement Period, if at all, by giving written notice of termination within sixty (60) days after receipt of the expense reconciliation prepared by Manager with respect to that Measurement Period.

(e)   Promptly after the termination of this Agreement, Manager shall deliver to Company any and all proprietary Company financial data including budgets, contracts, and purchase orders relating to the Managed Property that are in Manager's possession.

3.   <u>Responsibilities of Manager</u>.   The Services to be provided by Manager are generally described in Exhibit "B" attached hereto and made a part thereof.  Except to the extent specifically provided to the contrary in Exhibit "B", Manager shall:

(a)   <u>Reporting Requirements</u>.   Provide a comprehensive monthly management report regarding the maintenance and operation of the Managed Property in form mutually satisfactory to Manager and Company.

(b)   <u>Handle Complaints</u>.   Handle complaints and requests relating to the Managed Property.

(c)   <u>Employees and Contractors</u>.   Employ, discharge, and supervise all on-site employees or contractors required for the efficient operation and maintenance of the Managed Property.  All on-site personnel, except independent contractors and employees of independent contractors, shall be employees of Manager.  All matters pertaining to the employment, supervision, compensation, promotion and discharge of such employees are the responsibility of Manager.

(d)   <u>Property Maintenance</u>.   Maintain the Managed Property in a clean and neat condition, and make and supervise all repairs, alterations, and modifications which are necessary for the efficient operation of the Managed Property.  All expenditures and service contracts which in the aggregate are in excess of $10,000.00 or expenditures in excess of $5,000 which

S:Mark:subaru:Companyfmc.doc                    2            Intial Company

Manager:  M

have not been projected in the current approved budget shall require prior written approval of Company. Manager shall prepare written specifications for all work expected to cost over $5,000.00 and, if requested by Company, obtain three competitive bids from contractors. In case an emergency arises and requires repairs in excess of $5,000, Manager shall attempt to contact Company by telephone for oral approval. However, if a Company representative is not available, then Manager may order emergency repairs without specific authority from Company, in which case Manager shall advise Company of the repairs undertaken as soon as possible by telephone and in writing.

(e) <u>Utility Services</u>. Arrange, in the name and at the expense of Company, for all utility services, including but not limited to gas, water and electric.

(f) <u>Other Services</u>. Obtain and manage janitorial, window cleaning, trash removal, interior landscaping, HVAC, elevator, fire sprinkler & alarm, security, pest control, landscaping, snow plowing, parking lot sweeping, food service and other services necessary and mutually agreed upon by Company and Manager for the operation of the Managed Property.

(g) <u>Legal Actions</u>. Manager shall advise Company of the commencement of any legal action or proceeding against or affecting Company and concerning the operation of the Managed Property within 48 hours of the earlier of Manager becoming aware of or recieving notice of said legal action or proceeding and provide Company the information in Manager's possession as may be reasonably required for Company's defense of such action.

(h) <u>Coordination With Company</u>. Manager will contact Company when any of its acts/omissions in fulfilling its obligations hereunder are expected to adversely affect Company's operations. Company will assign a coordinator to assist in scheduling any downtime of office or computer functions in order for Manager to perform its obligations hereunder. Manager shall cooperate with Company in scheduling downtime so as to minimize interference with Company operations.

(i) <u>Subcontractor Insurance Coverage</u>. Require all contractors performing services, maintenance, repairs and/or alterations to maintain insurance coverage and, when and if appropriate, bonds of such kinds and in such amounts as are reasonable under the circumstances or otherwise required by Company. Manager shall obtain a Certificate of Insurance from all contractors as proof of compliance with the service contract insurance provisions.

(j) <u>Single Point of Contact</u> -- Act as Company's single point of contact for any facility management services that

S:Mark:subaru:Companyfmc.doc                    3                    Intial Company: _____

                                                                     Manager: _M H_

may be provided by affiliates of Manager in other regions of the
United States.  For this purpose Manager will, at Company's
request, provide Company with an introduction to affiliates of
Manager providing facility management services in other regions,
consult with Company providing proposals submitted by any
affiliate of Manager for facility management services in such
other regions, which will reflect a five percent (5%) discount
off of any such affiliate's normal market fee structure in
recognition of the additional volume of business provided to
Manager and its affiliates by Company.


        4.    Manager's Personnel and Subcontractors.

              (a)   All direct and indirect employment costs of
Manager's on-site employees at the Managed Property (as set forth
in Exhibit "C" attached hereto and made a part thereof and
modified from time to time in approved annual operating budgets)
shall be reimbursed by Company as provided in Section 5 hereof.

              (b)   In the event Manager hires either of
Company's two existing Maintenance Engineers, Marty Baumgartner
or Eric Fritz, Company will subsidize the base wage paid those
individuals for the initial twenty four (24) months of this
Agreement.  The amount of the subsidy (the "Subsidy Payment")
shall be the difference between the base wage paid those
individuals while employed by Company and the base wage offered
by Manager to those individuals, and will include all indirect
employment costs attributable to that differential. Upon
expiration of the twenty four (24) month term of the subsidy, the
compensation paid to these individuals will not include the
subsidy component, and Manager assumes no obligation to pay those
individuals base wages in excess of the base wage Manager is
willing to pay in the absence of the subsidy.

        The letter from Manager to these individuals offering
employment will detail the base wage offered by Manager (the
"Unsubsidized Wage") and the amount of the subsidy.  The
Unsubsidized Wage will be used for consideration of future base
wage increases, which shall be in accordance with Manager's
standard policies and procedures.  In the event of an increase in
the Unsubsidized Wage during this twenty four (24) month subsidy
period, the Subsidy Payment will decrease accordingly.  The
Subsidy Payment will be payable as part of the labor costs paid
by Company under this Agreement, and will cease with respect to
either of these individuals if and when that individual is no
longer assigned to the Managed Property.

(c)   In the event Manager hires either of Company's two (2) existing Maintenance Engineers, Marty Baumgartner or Eric Fritz, Company agrees to reimburse Manager for any severance costs associated with the termination of either individual during the initial twelve (12) months of this Agreement, provided the termination is the result of Company reducing the number of properties being managed or modifying the scope of work as outlined in Exhibit A and Exhibit B, respectively.  Company will detail in writing within thirty (30) days of the Effective Date, the severance costs that will apply to Section 4(c) herein.

(d)   Company will provide Manager a copy of its existing policies and procedures for the conduct of Company personnel at the Managed Property.  The employees of Manager and its subcontractors shall be bound by such policies and procedures when working at the Managed Property.  If any Manager employee or Manager subcontractor employee performing services for Company is documented by Company to have repeatedly or seriously violated these policies and procedures, then upon Company providing such documentation to Manager, Manager will relieve such person, or cause Manager's subcontractor to relieve such person, from performing Services for Company under the terms of this Agreement and a qualified replacement will be provided. Nothing contained in the preceding sentence shall be interpreted to require Manager or Manager's subcontractors, to terminate the employment of any such person.  Any such action or any other disciplinary action against any such a person will be within the sole discretion of Manager, or Manager's subcontractor.

5.   Compensation and Reimbursement.

(a)   As compensation for its services, Manager shall be paid the fees specified in Exhibit "C".  Manager shall also be entitled to reimbursement for its reasonable out-of-pocket costs incurred in performing Services as set forth in Exhibit "B" and Sections 3 and 4 hereof, and included and approved by Company in the annual operating budget.

(b)   Manager will submit invoices on or about the last day of each month for Manager's fees and all labor costs expected to be incurred during the following month in accordance with the approved budget, and any additional labor costs for the prior month due to overtime or other non-budgeted expenses.  If the reconciliation of the prior month's labor costs indicates that actual labor costs were less than the amount funded for such month, the difference shall be credited against the amount invoiced for the following month's labor costs.  Company shall fund the invoiced amount to Manager within thirty (30) days after receipt of an invoice.

S:Mark:subaru:Companyfmc.doc                 5              Intial Company: _____

Manager: _M #_

CONFIDENTIAL

SOA 000057

(c)   To the greatest extent practicable all direct third party expenses incurred in performance of the Services shall be paid by Company directly.  At Company's request Manager shall review all third party invoices for appropriateness and code such invoices for payment in accordance with Company's system of accounts.  Manager shall have no obligation to advance its own funds for payment of any reimbursable expenses incurred in performance of the Services.

(d)   Manager has represented to Company that certain operating expense savings with respect to the Managed Property are achievable over the term of this Agreement.  In order to provide appropriate incentives to Manager to achieve operating expense savings, Manager's base compensation under this Agreement shall be subject to reduction or increase by the penalty and bonus amounts to be calculated and paid as provided in Exhibit "D" attached hereto and made a part thereof.

6.    Insurance.

(a)   Manager at its expense will secure and keep in force at all times while Services are being performed under this Agreement, the following insurance coverages and their respective minimum limits:

(i)   Worker's Compensation & Employer's Liability Insurance - Workers' Compensation Insurance, with applicable statutory required limits; and Employer's Liability Insurance, with minimum limits of $1,000,000 per occurrence;

(ii)   Commercial General Liability Insurance – Combined Bodily Injury Liability, Including for Death, and Property Damage Liability, with a limit of not less than $1,000,000 per occurrence, including:  Contractual Liability (to cover Manager's indemnification obligations contained in this Agreement); Products and Completed Operation Liability, which will be maintained for not less than one year following termination of this Agreement; Independent Contractor's Liability, and Broad Form Property Damage Liability;

(iii)   Excess Liability Insurance - Excess or umbrella liability policy(ies) with a limit of at least $4,000,000 per occurrence in excess of the limits of each of the above specified coverage(s) and following the form of the above specified coverages, other than Workers Compensation Insurance; and

(iv)   Broad Form Property Insurance - To provide coverage for those items that are in Manager's care, custody and control.  Such coverage is to be in an amount not less than $1,000,000 at any given time.

S:Mark:subaru:Companyfmc.doc                    6                    Intial Company:

Manager: M.Y

(b)   Company at its expense will secure and keep in force during the term of this Agreement the following insurance coverages and their respective minimum limits:

(i)   Casualty Insurance - all risk property damage/casualty insurance on a full replacement cost basis for all buildings, improvements and personal property owned by Company on the Managed Property, with a boiler and machinery endorsement or written on a form which includes typical boiler and machinery coverage;

(ii)   Commercial General Liability Insurance - Combined Bodily Injury Liability, Including for Death, and Property Damage Liability, with a limit of not less than $1,000,000 per occurrence, including:  Contractual Liability (to cover Company's indemnification obligations contained in this Agreement); Products and Completed Operation Liability, which will be maintained for not less than one year following termination of this Agreement; Bailee's Liability; Independent Contractor's Liability, and Broad Form Property Damage Liability;

(iii)   Excess Liability Insurance - excess or umbrella liability policy(ies) with a limit of at least $4,000,000 per occurrence in excess of the limits of the above specified Commercial General Liability coverage.

The insurance policies obtained by Company pursuant to clauses (ii) and (iii) above shall be endorsed to provide that Manager is an additional insured.

(c)   Promptly after the execution of this Agreement each party shall provide the other with Certificates of Insurance confirming that the required coverages are in effect and shall subsequently provide the other party with replacement Certificates of Insurance thirty (30) days prior to the renewal date of each of such policies.  All insurance carriers shall be licensed to do business in the state in which the Managed Property is located and shall have a Best's rating of at least A- and a financial size category of at least X.  Each Certificate of Insurance shall provide that the insurance company will give the certificate holder thirty (30) days prior written notice of the cancellation of or material change to any such insurance policy. The insurance required to be provided pursuant to this Section may be provided under so called blanket policies of insurance so long as (i) the coverage afforded to the other party to this Agreement shall not be reduced or diminished by reason of the use of such blanket policy and (ii) all of the requirements set forth in this Section with respect to such insurance are otherwise satisfied.

(d)   Company, Manager and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard to the extent covered or required hereunder to be covered in whole or in part by insurance on the Managed Property or in connection with property on or activities conducted on the Managed Property, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof. This waiver shall not be required if the insurance carrier charges an additional premium in order to provide such waiver and the party benefiting from the waiver does not agree to pay the additional premium.

7.   <u>Default and Remedies</u>.

(a)   Each of the following will constitute an event of default by a party (a "Default"):

(i)   Failure of a party to pay monies when due hereunder if such failure is not cured within ten (10) days after receipt of written notice thereof from the other party;

(ii)   If any representation made by a party in this Agreement is discovered to have been purposely misrepresented in any material respect as of the date the same was made; or

(iii)   Failure in any respect of a party to perform as required by this Agreement, except for payment of monies when due, or failure in any respect of a party to observe any covenant, condition, or agreement required by this Agreement to be performed by it and such failure is not cured within thirty (30) days after receipt of written notice thereof from the other party.

(b)   If a Default by Manager occurs and continues, without cure, Company may:

(i)   Upon notice to Manager immediately terminate this Agreement, in which event Company may use any equipment on Company's premises belonging to Manager required to continue providing Services.  Company will reasonably compensate Manager for the use of such equipment until such reasonable time as Company is able to replace the Service provided by such equipment and without prejudice to Company's rights with respect to Manager's obligations hereunder then accrued and remaining unsatisfied;

Intial Company:

Manager: _N H_

CONFIDENTIAL                                                    SOA 000060

(ii)   Cause Manager, at its sole cost and expense, to remove any or all of Manager's equipment from Company's premises; and/or

(iii)   Exercise any other right or remedy that may be available to Company at law or in equity, provided that Manager's liability to Company for any and all damages shall be limited to the least of (A) Company's actual damages, (B) the actual management fees received by Manager to the date of the Default, or (C) $57,100 in the aggregate, except that nothing contained in this paragraph shall relieve Manager (D) from obtaining and maintaining such insurance policies as it is required to obtain and maintain hereunder or (E) from liability for damages which are paid for by insurance maintained by Manager, without recourse to Manager personally.

Notwithstanding any other provision of this Agreement:  (A) Company will in all events be required to mitigate its damages to the extent reasonably possible; and (B) in no event will Manager be liable to Company under this Agreement for any special, indirect, or consequential damages, in excess of the limits stated in Section 7(b)(iii), except that nothing contained in this paragraph shall relieve Manager from obtaining and maintaining such insurance policies as it is required to obtain and maintain hereunder or from liability for damages, including without limitation, special, direct or consequential damages, which are paid by insurance maintained by Manager, without recourse to Manager personally.  This limitation will not preclude Company from recovering any other damages or pursuing any other remedy or right specifically permitted by this Agreement or for contribution arising out of any claim by any third party caused solely by the gross negligence or willful misconduct of Manager.

(c)   If a Default by Company occurs and continues without cure, Manager may:

(i)   Demand in writing that Company, and Company will upon receipt of such demand, promptly re-deliver to Manager at Company's expense any equipment owned by Manager on Company's premises or, at its option, Manager may upon such demand peaceably take possession of and remove such equipment in a manner permitted by applicable law without interference;

(ii)   Upon notice to Company immediately terminate this Agreement, without prejudice to Manager's rights in respect of Company's obligations hereunder then accrued and remaining unsatisfied; and/or

(iii)   Exercise any other right or remedy that may be available to Manager at law or in equity.

Intial  Company: _____

Manager: _MH_

CONFIDENTIAL                                    SOA 000061

Notwithstanding any other provision of this Agreement:  (A) Manager will in all events be required to mitigate its damages to the extent reasonably possible; and (B) in no event will Company be liable to Manager under this Agreement for any special, indirect, or consequential damages.  This limitation will not preclude Manager from recovering any damages or pursing any other remedy or right specifically permitted by this Agreement or for contribution arising out of any claim by any third party caused solely by the wrongful acts of Company.

8.   Indemnification.

(a)  Company shall (1) indemnify and save Manager, its employees, agents, servants and contractors harmless from and against claims, losses, expenses, or liabilities by reason of any cause whatsoever either in and about the Managed Property resulting from Manager carrying out the provisions of this Agreement unless such damages or injuries result from the willful misconduct or gross negligence of Manager, its employees, agents, servants or contractors or acts committed or omitted by Manager, its employees, agents, servants or contractors in violation of this Agreement and (2) defend promptly and diligently, at Company's sole expense, any claim, action or proceeding brought against Manager, or Manager and Company jointly and severally, arising out of or in connection with Manager carrying out the provisions of this Agreement; and to hold harmless and fully indemnify Manager from any judgment, loss or settlement on account thereof, except that this undertaking to defend and indemnify and hold Manager harmless shall not apply to any claim, action or proceeding resulting from willful misconduct or gross negligence of Manager or its employees or agents or acts committed or omitted by Manager or its employees or agents in violation of this Agreement.

(b)  Manager shall and hereby does indemnify, defend and hold harmless the Company, its parents,affiliates, subsidiaries, officers, directors, employees and agents from and against any and all suits, claims, demands or liabilities and all damages, costs, and expenses whatsoever arising by reason of any breach by Manager, its employees, agents, servants, or contractors of any of the provisions of this Agreement or by reason of any gross negligence, fraud, wrongful act or willful default hereunder by Manager, its employees, agents, servants, or contractors.  Manager shall also indemnify, defend and hold harmless the Company from and against any and all suits, claims, demands or liabilities and all damages, costs and expenses whatsoever brought by an employee of the Manager and arising from any accident covered under the Manager's workers compensation coverage except and to the extent caused by willful misconduct or gross negligence of the Company or its employees or agents.

Intial Company

Manager: _M.h_

CONFIDENTIAL

SOA 000062

9.   <u>Company Representative</u>.  To foster efficient communication, Company shall at all times appoint a representative to be the primary contact between Company and Manager with respect to the services to be provided by Manager under this Agreement.  The initial Company representative shall be Mr. Stephen A. Gale.

10.   <u>Confidential and Proprietary Information; Employees</u>.

(a)   In the performance of its duties hereunder Manager may receive information from Company that Company considers confidential.  All information provided by Company to Manager that is marked "confidential" or otherwise identified by Company to Manager as confidential ("Confidential Information") shall be maintained in strict confidence by Manager.  Except as may be authorized by Company in writing, Manager shall not disclose Confidential Information to any person other than Manager's attorneys, accountants, employees and subcontractors directly engaged in the provision of Manager's services under this Agreement.  Involuntary disclosure, such as pursuant to a subpoena or court order, or made as part of any proceeding brought to resolve a dispute between Company and Manager, shall not constitute a breach by Manager of this Section 10, provided that Manager shall give Company prior written notice of such disclosure so that Company may seek any protective orders it deems reasonably necessary.

(b)   In the performance of its duties hereunder Company may receive information from Manager that Manager considers confidential.  All information provided by Manager to Company that is marked "confidential" and Company acknowledges as confidential ("Confidential Information") shall be maintained in strict confidence by Company.  Except as may be authorized by Manager in writing, Company shall not disclose Confidential Information to any person other than Company's attorneys, accountants, employees and subcontractors directly engaged in the provision of Company's duties under this Agreement.  Involuntary disclosure, such as pursuant to a subpoena or court order, or made as part of any proceeding brought to resolve a dispute between Manager and Company, shall not constitute a breach by Company of this Section 10, provided that Company shall give Manager prior written notice of such disclosure so that Manager may seek any protective orders it deems reasonably necessary.

(c)   Manager's employees are an important asset of Manager.  Thus Company agrees that at no time during the term of this Agreement or during the one (1) year period following its termination will Company or any affiliate of Company solicit for employment, or otherwise employ, any employee of Manager involved

Intial Company:

Manager:  M H

CONFIDENTIAL

in the performance of Manager's duties under this Agreement. This restriction shall not apply to any employee that was an employee of Company or an affiliate of Company prior to the Effective Date and hired by Manager at Company's request.

(d)   The covenants set forth in this Section 10 shall survive the termination of this Agreement and shall be specifically enforceable.

11.   <u>Law and Safety Compliance</u>.   Manager will be required at all times during the term of this Agreement in the course of its performance hereunder to be in compliance with all applicable state, local, and federal laws and regulations in effect of which Manager has knowledge or should have knowledge. Manager and its on-site employees will comply with all Company security and safety regulations in effect at the Managed Property of which Company has given Manager notice.   However, Manager shall be responsible for the safety and health of its employees and shall establish its own safety, regulations and work practices as appropriate for the protection of its employees, or as required by federal, state and local regulations.

12.   <u>Force Majeure</u>.   Except for the payment of monies when due and owing, for the period and to the extent that a party hereto is prevented from fulfilling, in whole or in part, its obligations hereunder by reason of any law or governmental regulation or other governmental act, or flood, war, fire, riots, strikes, explosion or other natural catastrophe or act of God, or acts of third parties or other causes beyond such party's reasonable control (a "Force Majeure Event"), such party shall be temporarily excused from such obligations as are and to the extent so prevented until the abatement of such Force Majeure Event.   The term of this Agreement will not be extended by the period of duration of the Force Majeure Event.   Notice of any such disability and the abatement will be promptly given to the other party by the party claiming same.

13.   <u>Governing Law</u>.   This Agreement is made subject to the laws of the State of New Jersey, without reference to the choice of law provisions of that State.   The courts of that state will have proper original jurisdiction over any dispute arising hereunder.

14.   <u>Notices</u>.   Any and all notices permitted or required to be given hereunder will be deemed duly given:   (a) upon actual delivery, if delivery is by hand; (b) three (3) business days after delivery into the official mail if delivery is by postage paid registered or certified return receipt request mail; (c) or one business day after delivery to an overnight carrier if delivery is made by overnight carrier guaranteeing next business day delivery.   Each such notice shall be sent to

S:Mark:subaru:Companyfmc.doc                    12                Intial Company:

Manager: _M h_

CONFIDENTIAL                                                         SOA 000064

the respective party at the address indicated below or at any other address as the respective party may designate by notice delivered pursuant hereto.

If to Company:

Subaru of America, Inc.
Attn:  Mr. Stephen A. Gale
Subaru Plaza
2235 Route 70 West
Cherry Hill, NJ 08002

with a copy to:

Subaru of America, Inc.
Attn:  Legal Department
Subaru Plaza
2235 Route 70 West
Cherry Hill, NJ 08002

If to Manager:

Trammell Crow NE, Inc.
Attn:  Mr. Ty Chilcote
One Franklin Plaza
200 North 16th Street
Philadelphia, PA 19102

with a copy to:

Trammell Crow NE, Inc.
Attention:  Mr. Greg Latran
575 East Swedesford Road
Suite 150
Wayne, PA 19087

15.  <u>Non-Waiver</u>.  No term or provision of this Agreement will be deemed waived and no Default of breach will be deemed excused, unless such waiver or consent is in writing and signed by a representative of the party claimed to have waived or consented.  Consent by a party to, or waiver of, a breach or Default by the other party, whether express or implied, will not constitute a consent to, waiver of, or excuse any different or subsequent breach or Default.

16.  <u>Partial Invalidity</u>.  If any term or provision of this Agreement is finally found to be illegal or unenforceable by a court or other tribunal of competent jurisdiction, then, notwithstanding such illegality or unenforceability, this

S:Mark:subaru:Companyfmc.doc                13

Intial Company

Manager:  M H

Agreement will remain in full force and effect unless this Agreement is thereby rendered impossible to perform.

17.   Section Headings.   The section headings used in this Agreement are for the convenience and reference of the parties only, and shall not be deemed a part of, or utilized in interpreting this Agreement.

18.   Survival.   The terms and provisions contained in this Agreement that by their sense and content are intended to survive the performance thereof or termination hereof will so survive the completion of performance and/or termination of this Agreement, including but not limited to the making good of any and all payments due hereunder.

19.   Counterparts.   This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

20.   Total Agreement.   This Agreement, including the Exhibits hereto, is a total and complete integration of any and all undertakings existing between Manager and Company and supersedes any prior written agreements, promises or representations between them.   This Agreement may be modified only by an agreement in writing signed by Manager and Company.

[next page is signature page]

Intial Company

Manager:  M H

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have set forth their respective hands on the respective dates set forth below, each by its duly authorized representative.

Company:

SUBARU OF AMERICA, INC.

By: _____

Name: Joseph T. Scharff

Title: V.P.-Admin. & Treasurer

Manager:

TRAMMELL CROW NE, INC.

By: _____

Name: Mark Hockenjus

Title: vice president

S:Mark:subaru:Companyfmc.doc                    15

Intial Company: _____

Manager: MH

CONFIDENTIAL

SOA 000067

EXHIBIT "A"

## DESCRIPTION OF MANAGED PROPERTY

Subaru Plaza, 2235 West Marlton Pike, Cherry Hill, N.J.
(Owned office building, approximately 130,000 square feet)

Data Center Building, 7040 Central Highway, Pennsauken, N.J.
(Owned flex building, approximately 65,000 square feet)

Service Training Center, 7015 Central Highway, Pennsauken, N.J.
(Leased flex building, approximately 46,526 square feet)

Penn Jersey Region Building, 1528 Glen Avenue, Moorestown, N.J.
(Leased distribution building, approximately 100,000 square feet)

Intial Company:

Manager: _M h_

CONFIDENTIAL

SOA 000068

EXHIBIT "B"

### SCOPE OF WORK

### Customer Service

- Develop a strong working relationship with Steve Gale and any other person(s) designated by COMPANY as the project liaison for this assignment.

- Conduct an annual, in-depth survey of appropriate COMPANY user groups and compile results for review by COMPANY  management and MANAGER. The information gained from these results will be used to fine-tune MANAGER's overall management service.

- Develop a customized format to effectively communicate all building operations issues which will affect building occupants.

- Establish and monitor performance standards tailored to meet COMPANY's needs.

### Day-to-day Operation and Maintenance of the Property

- Provide daily up-keep and maintenance of the buildings, grounds and parking lots according to levels of service required by COMPANY and similar in scope as previously provided by COMPANY'S STAFF. Typical tasks include, but not limited to, HVAC maintenance, roof maintenance, ceiling tile replacement, patching and painting wall surfaces, repair and replacing floor surfaces, plumbing and electrical repairs, light bulb replacement, janitorial duties, security and snow removal.

- Establish preventive maintenance, work order and energy management procedures.

- Develop aesthetic enhancement ideas to suit the requirements of COMPANY and implement those ideas when appropriate.

- Control liability exposure by adhering to the loss prevention guidelines of COMPANY's insurance carrier.

- Develop, train and maintain a professional maintenance/engineering/management staff.

- Apply for and maintain all licenses and permits necessary to operate the facility and administer facility compliance with all applicable regulations.

- Inspect the building regularly to ensure that quality standards are met.

Intial Company:

Manager: M H

CONFIDENTIAL

- Develop an Emergency Procedures manual and a Standard Operating Procedures manual within ninety (90) days of the Effective Date of this Agreement. The manuals shall include, but not limited to, procedures related to work order processing, customer satisfaction measures, contract administration, tool & equipment inventory, COMPANY/MANAGER communications, etc. COMPANY and MANAGER shall use good faith efforts to agree upon the form and content of these manuals; in the event COMPANY and MANAGER can not agree on the form and content of these manauals within ninety (90) days of the Effective Date; either party may terminate this Agreement by giving the other party thirty (30) days written notice.

- Interface with utility companies, local, state, and federal agencies relative to the operation of the Managed Property.

## Service Contracts and Supplies

- Secure and administer all service contracts and supplies involving, but not limited to, janitorial, window cleaning, trash removal, interior landscaping, HVAC, elevator, fire sprinkler & alarm, security, pest control, landscaping, snow removal, parking lot sweeping, food service.

- Review and re-bid (if necessary) all service contracts annually to seek the absolute best values.

- Work with vendors to alter specifications aimed at reducing costs without materially altering scope of services.

- Take advantage of economies of scale throughout MANAGER's critical mass of properties in the Northeast, as well as national vendor agreements.

- Monitor quality levels of all service · contracts by reviewing adherence to MANAGER's detailed specifications.

- Conduct general inspections as needed to ensure that all vendors and subcontractors are meeting quality standards.

## Operating Budgets

- Establish annual operating and capital budgets for the property with the input of COMPANY. This would be a "zero based" approach to budgeting, not just a percentage adjustment to the prior year's budget.

- Review expense variance reports monthly and take appropriate corrective action.

- Identify and aggressively pursue costs savings wherever possible.

- Periodically review service scope to address changes in COMPANY's service requirements which would necessitate budget adjustments.

Intial Company:

Manager: M H

CONFIDENTIAL

**Accounts Payable**

- Review and approve all invoices relating to the operation of the Managed Property.

- Code each invoice to the chart of accounts designated by COMPANY and submit to COMPANY accounting department for payment.

- Process each invoice through MANAGER's property management/accounting system (CTI) in order to track the facility operating expenses and to provide periodic reports (i.e. budget variance reports, general ledgers, etc.)

**Utilities**

- Monitor utility costs and make recommendations for energy conservation.

**Reporting**

- Provide comprehensive monthly management reports to meet the exact needs of COMPANY including an executive summary, operations report, budget variance report and a general ledger.

- Hold periodic meetings with COMPANY representatives to review financial performance, current and proposed special projects, service standards, changes in corporate policies and other relevant issues.

**Space Planning Design**

- Provide COMPANY an annual space planning allowance for all Southern New Jersey facilities of 24,000 square feet designed as part of the base fee structure. Additional space planning available at COMPANY's direct cost.

**Communications Program**

The communications and reporting program (topics of discussion might include staffing capabilities, capital projects or the maintenance work order system utilized for this assignment) will be customized to meet COMPANY's exact requirements. The program we propose for consideration is as follows:

- Monthly project team meetings including MANAGER's dedicated Facility Manager and Steve Gale. Other individuals such as Ty Chilcote and Greg Latran would participate in these meetings as necessary or desired by COMPANY.

- A detailed monthly status report outlining the prior month's activity on the portfolio would be provided to the project team by the Facility Manager.

- A monthly financial and variance report would be compiled with the level of detail necessary for COMPANY to fully understand the cost of operating the facilities.

Intial Company:

Manager: M H

- Quarterly meetings between Ty Chilcote from MANAGER and Steve Gale from COMPANY, would occur to review MANAGER's performance and to ensure that COMPANY's goals are being met. This facilities management oversight function could be expanded to include other management representatives from both companies to ensure that the ongoing operation is meeting or exceeding COMPANY's exact needs.

Intial Company

Manager: _MH_                    SOA 000072

CONFIDENTIAL

EXHIBIT "C"

<u>MANAGEMENT FEE & REIMBURSEMENT SCHEDULE</u>

## Direct Costs:

The following direct costs for property management will be paid by COMPANY:

- Salaries and associated employee costs (in aggregate "direct costs") of the two (2) on-site   Maintenance Engineers, plus 50% of the direct costs of the Facility Manager and 10% of the direct costs of the Property Assistant assigned to the Managed Property.

- Managed Property operating expenses including all service contracts and utilities.

- Project-specific consultant services (actual cost).

- Maintenance office with phones, office furniture and supplies.

- Training costs that are directly attributed to the project and have been previously approved by COMPANY.

- All necessary tools and equipment for maintaining the building as approved in the annual budget.

## Management Fees:

COMPANY will pay MANAGER a base management fee of $57,100 annually, payable in equal installments on the first of each month.

## Construction Management Services:

If MANAGER is engaged to perform construction management services for major capital improvement projects amounting to more than $10,000 in total project costs, a fee equivalent to 10% of the total hard and soft costs per project, up to $100,000, and 5% for any incremental costs over $100,000, will be due and payable to MANAGER

S:Mark:subaru:Companyfmc.doc                    21                    Intial  Company:

Manager: _MH_

CONFIDENTIAL                                                                                      SOA 000073

Exhibit "D"

Calculation of Bonus/Penalty

1.    The amount of the bonus or penalty payable with respect to a Measurement Period (as defined in Paragraph 2 of Exhibit "D" herein) shall be based on the amount, by which the Specified Costs incurred in the 1996 Measurement Period are less than $1,142,366 (the "Adjusted Baseline Costs") or by which the Specified Costs incurred in the 1997 and 1998 Measurement Periods are less than $2,289,101 (the "Annualized Baseline Costs").   For purposes of this calculation, "Specified Costs" shall mean those costs incurred in the following budget categories:  Janitorial, M&R Grounds, M&R Buildings, M&R Equipment, Security, Utilities, Real Estate Taxes, Other Office Expenses and Maintenance Salaries, subject to the adjustments provided in paragraph 3 below.

2.    If for any Measurement Period the amount by which Specified Costs are less than the Baseline Costs (the "Savings") is greater than the Bonus Threshold for that Measurement Period, Manager shall be entitled to a bonus equal to twenty five percent (25%) of the amount by which the Savings are in excess of the Bonus Threshold, not to exceed a total bonus of $11,420 for any Measurement Period.   If for any Measurement Period the Savings are less than the Penalty Threshold for that Measurement Period, the fees otherwise payable to the Manager under this Agreement shall be reduced by fifty percent (50%) of the amount by which the Savings were less than the Penalty Threshold, not to exceed a total penalty of $22,840 for any Measurement Period.   If for any Measurement Period the Savings are greater than the Penalty Threshold but less than the Bonus Threshold, no bonus or penalty would be payable for that Measurement Period.   For purposes of these calculations, the following Bonus and Penalty Thresholds shall apply for the indicated Measurement Periods:

| Measurement Period | Penalty Threshold | Bonus Threshold |
|---|---|---|
| 1996 (5/4/96 - 12/31/96) | $ 89,556 | $123,140 |
| 1997 (1/1/97 - 12/31/97) | $164,944 | $226,798 |
| 1998 (1/1/98 - 12/31/98) | $224,368 | $308,506 |

3.    The Bonus and Penalty Thresholds assume normal operating conditions.   In order to assure a basic level of fairness in the determination of savings achieved by Manager, the following expenses shall be excluded from the calculation of Specified Costs in any Measurement Period:

Intial Company:

CONFIDENTIAL

Manager: M.H      SOA 000074

(a)   Expenses attributable to an increase in utility rates in excess of five percent (5%) per year;

(b)   Overtime expenses in excess of two (2) hours per week per Maintenance Engineer related to a major project requested by Company;

(c)   Expenses attributable to snow removal costs in excess of twelve cents ($0.12) per square foot per year; and

(d)   Any other expense that Company and Manager mutually agree was not anticipated and thus should be excluded.

Costs incurred in the management and operation of the Managed Property shall be accounted for in a manner consistent with past Company practice to assure fair measurement of the savings achieved.  In the event any of the facilities included in the Managed Property are expanded or reduced, Company requests a material expansion or reduction of the scope of work to be performed by Manager, or there is a material change in the use (and a quantified variable cost increase or decrease), Company and Manager shall mutually agree on any changes that may be appropriate to the Bonus and Penalty Thresholds.

4.    On or about March 1 following each Measurement Period Manager will deliver to Company an expense reconciliation statement summarizing in reasonable detail the Specified Costs incurred during the Measurement Period then ended and calculating the bonus or penalty, if any, payable with respect to that Measurement Period.  If Company does not object to this reconciliation within thirty (30) days after its delivery, Company will be deemed to have agreed with the information and calculations contained in the reconciliation.  If Company does object to any of the information or calculations contained in the reconciliation statement, or requires further information regarding the statement, Company will give Manager written notice specifying Company's objections or additional information requested.  Company and Manager shall then promptly meet to resolve any open questions regarding the reconciliation statement and agree on the final calculation of any bonus or penalty due with respect to that Measurement Period.  Any bonus that is payable shall be included in Manager's next invoice submitted after the reconciliation statement has been approved or deemed approved by Company.  Any penalty that is payable shall likewise be credited against the next installment(s) of Manager's fee invoiced after the reconciliation statement has been approved or deemed approved by Company.

Intial Company:

Manager: MH

CONFIDENTIAL                                          SOA 000075