Andrew A. Weissmann (admitted *pro hac vice*)
Andrew J. Lichtman
JENNER & BLOCK LLP
919 Third Avenue
New York, New York 10022
Tel:  (212) 891-1600
Fax:  (212) 891-1699
aweissmann@jenner.com
alichtman@jenner.com

Daniel J. Weiss (admitted *pro hac vice*)
Keri L. Holleb Hotaling (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654
Tel:  (312) 222-9350
Fax:  (312) 527-0484
dweiss@jenner.com
khotaling@jenner.com

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY, CAMDEN DIVISION

| | |
|---|---|
| _____ )<br><br>SUBARU OF AMERICA, INC. and )<br>GREAT AMERICAN INSURANCE )<br>COMPANY, )<br>  )<br>  Plaintiffs, )<br>  v. )<br>  )<br>CBRE, INC., )<br>  )<br>  Defendant. )<br>_____ ) | <br><br><br><br><br><br>Case No. 1:20-cv-08603-NLH-AMD<br>Hon. Noel L. Hillman<br><br><br>Motion Day: January 19, 2021 |

## DEFENDANT CBRE'S BRIEF IN SUPPORT OF ITS
## RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

Introduction ....................................................................................................1

Argument......................................................................................................4

I.    The Economic Loss Doctrine Bars Plaintiffs' Tort Claims. ...........................4

II.   The Limitation Of Liability Applies To Any Remaining Claims. .................9

      A.    Section 7 Unambiguously Applies To Plaintiffs' Remaining
            Claims........................................................................................9

      B.    Plaintiffs Have Not Alleged Indemnification Against CBRE. ...........11

III.  Count V Should Be Dismissed. ...................................................................15

Conclusion ...................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*,
    552 F.Supp.2d 515 (E.D. Pa. 2008)......................................................................14

*Atlantic City Assocs. LLC, v. Carter & Burgess Consultants, Inc.*,
    453 F. App'x 174 (3d Cir. 2011) ..........................................................12, 13, 14

*Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*,
    226 F. Supp. 2d 557 (D.N.J. 2002)..................................................................2, 5, 6

*Cudjoe v. Ventures Trust*,
    2019 WL 949301 (D.N.J. Feb. 26, 2019) .....................................................4, 6, 8

*Investors Savings Bank v. Waldo Jersey City, LLC*,
    12 A.3d 264 (N.J. Super. Ct. App. Div.2011) ...................................................12

*Kornblith v. Rothe*,
    1991 WL 7674 (D.N.J. Jan. 23, 1991)..................................................................14

*Masterank Wax Inc. v. RFC Container, LLC*,
    2020 WL 2744603 (D.N.J. May 27, 2020).......................................................6, 8

*Montclair State Univ. v. Oracle USA, Inc.*,
    2012 WL 3647427 (D.N.J. Aug. 23, 2012) ..............................................3, 4, 5, 9

*Network Commodities, LLC v. Golondrinas Trading Co.*,
    2013 WL 1352234 (D.N.J. Apr. 1, 2013)..............................................................7

*Ribble Co. v. Burkert Fluid Control Sys.*,
    2016 WL 6886869 (D.N.J. Nov. 22, 2016) .......................................................6, 7

*State Capital Title & Abstract Co. v. Pappas Bus. Servs.*,
    646 F. Supp. 2d 668 (D.N.J. 2009).......................................................................6

*TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*,
    2013 WL 6048720 (D.N.J. Nov. 14, 2013) ..........................................................5

*Touristic Ents. Co. v. Trane, Inc.*,
    *2009 WL 3818087, at *1-2 (D.N.J. Nov. 13, 2009)*..............................................8

*Travelers Indem. Co. v. Dammann & Co.*,
594 F.3d 238 (3d Cir. 2010) ............................................................8, 11, 12, 14

**Introduction**

CBRE and Subaru, both sophisticated parties, negotiated a business agreement that covered every aspect of their relationship, including the allocation of risk.  Plaintiffs allege that CBRE breached that Agreement by approving invoices that it knew were false.  (Counts I & II.)  Those claims are appropriately addressed under the parties' agreed provisions governing such alleged breaches and remedies.  Plaintiffs, however, also seek to allege *tort* claims and thus bypass the parties' Agreement. (Counts III & IV.)  For those tort claims, Plaintiffs allege the same conduct (approving false invoices) and the same damages (the amount of the invoices) as with their contract claims.  But through the tort claims, Plaintiffs hope to avoid the Agreement, seek punitive damages, and otherwise take advantage of tort principles rather than the remedies the parties selected.  As CBRE established in its motion, the economic loss doctrine does not permit this tactic.

Plaintiffs have no valid response.  They do not even address the economic loss doctrine in earnest until the last few pages of their brief.  When they finally do, Plaintiffs do not deny that:  the parties' contract expressly addresses CBRE's duties with respect to contractors and their invoices; Plaintiffs themselves allege that CBRE's conduct violated those contractual duties; and Plaintiffs seek the same damages for their contract and tort claims alike.  Nor do Plaintiffs address multiple

cases applying the economic loss doctrine to bar fraud claims related to alleged false payment submissions under a contract, just as is alleged here.

Instead, Plaintiffs argue that CBRE's alleged conduct was "extrinsic" to the Agreement, but they are wrong.  The mere fact that Plaintiffs allege misconduct by CBRE employees does not make the alleged fraud "extrinsic"—if it did, the economic loss doctrine would never apply, because nobody contracts for fraud.  Rather, "an act that is in breach of a *specific contractual undertaking* [is] *not extrinsic*" to the contract.  *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 564 (D.N.J. 2002) (emphasis added).  Here, Plaintiffs allege that CBRE breached its contractual duty to approve only "appropriate" invoices.  Any alleged fraud was, at most, an alleged fraud *in the performance of that duty*— which is exactly the type of claim barred under New Jersey law.

Plaintiffs also argue that that they have alleged a "fraudulent inducement" theory involving "separate contracts" with Allied.  But there is no such theory nor any "separate contract" alleged in the complaint.  Moreover, even if Plaintiffs had alleged such a theory, fraudulent inducement does not avoid the economic loss doctrine when, as here, the subject of the alleged fraud is still within the express scope of the underlying agreement between the parties.

CBRE also established that Plaintiffs' non-tort claims are subject to the parties' limitation of liability agreement.  In response, Plaintiffs largely ignore their

own contract-based claims, instead arguing that such limitations are not enforceable with respect to fraud. But here, Plaintiffs give away the game. CBRE has not contended that fraud claims are subject to a limitation of liability; those claims are subject to the *economic loss doctrine* precisely because, when parties bargain for "specific remedies" and a "limitation of liability," that doctrine precludes tort claims seeking remedies "beyond those embraced by the contract." *Montclair State Univ. v. Oracle USA, Inc.*, 2012 WL 3647427, at *10 (D.N.J. Aug. 23, 2012) (internal quotations omitted). Plaintiffs also argue they can avoid the limitation of liability by reference to indemnification, but New Jersey law is clear that indemnification does not apply to "first-party" liability, which is what Plaintiffs allege.

At bottom, Plaintiffs argue that it would be unfair to enforce New Jersey law and the terms of their arms'-length agreement. But business parties enter into contracts that allocate risk precisely to avoid open-ended exposure and costly litigation. Subaru can seek to recover insurance proceeds, as it has done; it can seek restitution from Allied's owner, as it has done; and it can seek the remedies it negotiated in its Agreement with CBRE. What it cannot do under the law is avoid its own commercial agreement. The Court should enter judgment as a matter of law.

<u>**Argument**</u>

**I.    The Economic Loss Doctrine Bars Plaintiffs' Tort Claims.**

As CBRE established, Plaintiffs' tort claims are barred by the economic loss doctrine because they rest upon the same subject matter and alleged losses as their contract claims.  (Mot. at 7-11.)  Plaintiffs *admit* in their opposition that, under the parties' Agreement: "CBRE agreed to *hire* and *manage* subcontractors . . . *review the subcontractors' invoices*, and, if appropriate, *approve the invoices* to be paid directly by Subaru."  (Opp. at 3, emphasis added.)  The crux of all of Plaintiffs' claims is that CBRE allegedly violated those duties.  Plaintiffs' tort claims thus relate directly to the "subject matter of the contract," which means that Plaintiffs may not "use a tort claim to bypass the legal relationship created by the contract." *Cudjoe v. Ventures Trust,* 2019 WL 949301, at *4 (D.N.J. Feb. 26, 2019).

In response, Plaintiffs argue that CBRE's alleged misconduct was "extrinsic" to the contract (Opp. at 17-18), but that is wrong.  An "extrinsic" fraud is "extraneous to the subjects addressed by the parties' agreement." *Montclair*, 2012 WL 3647427, at *6.  Here, Plaintiffs' core allegations of fraud are that CBRE "signed the false invoices" and "submitted the false invoices" when it knew the invoices were false. (Am. Compl. ¶¶ 37-39.)  Those allegations overlap precisely with Plaintiffs' <u>*own*</u> description of the parties' contract, *i.e.*, CBRE agreed to "*review the subcontractors' invoices*, and, *if appropriate*, *approve the invoices*."  (Opp. at 3, emphasis added; *see*

*also* Am. Compl. ¶¶ 11-12.)  It is settled that "an act that is in breach of a specific contractual undertaking *would not be extrinsic*" for purposes of the economic loss doctrine.  *Bracco*, 226 F. Supp. 2d at 564 (internal quotations omitted) (emphasis added); *see also Montclair*, 2012 WL 3647427, at *5 (same rule).

Instead, Plaintiffs' fraud theory is a classic claim of "intrinsic" fraud, or "fraud in the *performance of a contract*," which is "not cognizable [in tort] under New Jersey law." *Bracco*, 226 F. Supp. 2d at 564 (emphasis added).  Plaintiffs admit as much when they argue that "knowingly approving false invoices" amounts to a "willful default" under the terms of the Agreement.  (Opp. at 12.)  Indeed, the most analogous cases cited by either party are *Bracco*, 226 F. Supp. 2d 557 and *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, 2013 WL 6048720 (D.N.J. Nov. 14, 2013), which both concerned alleged false submissions pursuant to a contract for the purpose of causing the plaintiff to pay money it did not owe.  In both cases, the court held that the false submissions—false reports in *Bracco* and false photographs in *TBI*—amounted to fraud in the *performance* of the contract, barring tort claims. *Bracco*, 226 F. Supp. 2d at 564-65; *TBI*, 2013 WL 6048720, at *5.

Plaintiffs have no real response to those cases.  Instead, Plaintiffs suggest that this case is different because they have alleged a "scheme" involving the "acceptance of bribes," which was "extraneous" to the Agreement.  (Opp. at 12, 17.)  But an alleged fraudulent scheme is *always* "extraneous" in the sense that parties do not

contract for fraud or misconduct.  The question is not whether the contract includes the misconduct, which is never true, but whether the alleged misconduct concerned "the subject matter of the contract and deal[t] with the performance of the contract." *Cudjoe*, 2019 WL 949301, at \*4; *see also Masterank Wax Inc. v. RFC Container, LLC*, 2020 WL 2744603, at \*3 (D.N.J. May 27, 2020) (plaintiff must allege "misrepresentations unrelated to the performance of the contract").  Where, as here, the alleged misconduct overlaps with contractual performance, the economic loss doctrine prohibits claims based upon "scheme[s] to cheat," *Bracco*, 226 F. Supp. 2d at 559, "devious, improper, and unrighteous" acts, *Ribble Co. v. Burkert Fluid Control Sys.*, 2016 WL 6886869, at \*1 (D.N.J. Nov. 22, 2016), and even "conspir[acy]," *Cudjoe*, 2019 WL 949301, at \*2.

Further, the significance of the alleged bribes is that they purportedly gave two CBRE employees a *motive* to approve false invoices.  But, whatever the alleged motive (be it personal gain, mistake, or otherwise), the alleged *fraud* on Subaru was the submission of false payment requests, just as in *Bracco* and *TBI*.  (*See* Am. Compl. ¶¶ 38-39.)  The economic loss doctrine does not hinge on the defendant's state of mind.  Rather, "*[h]ow* Defendants breached the contract, whether it be fraudulently or in mistaken good faith, is an issue to be resolved *within the contours of contract principles*."  *State Capital Title & Abstract Co. v. Pappas Bus. Servs.*, 646 F. Supp. 2d 668, 677 (D.N.J. 2009) (emphasis added).

Plaintiffs also argue that a "fraudulent inducement" theory involving "separate contracts" between Subaru and Allied saves their tort claims (Opp. at 17-18), but this theory fails for at least three reasons.  <u>First</u>, the complaint does not allege fraudulent inducement and does not identify any "separate contract," which is fatal.  *E.g.*, *Ribble*, 2016 WL 6886869, at *4 (inducement theory "not asserted" in pleading).   Plaintiffs attempt to rely on this Court's decision in *Network Commodities, LLC v. Golondrinas Trading Co.*, 2013 WL 1352234 (D.N.J. Apr. 1, 2013), but the plaintiff in that case alleged in detail "discrete, isolated agreements" that were "separately negotiated" between the parties.  *Id.* at *8.  Not so here.

<u>Second</u>, Plaintiffs' complaint and the Agreement *contradict* Plaintiff's new theory.  Plaintiffs allege that *CBRE*, not Subaru, hired Allied as its "subcontractor" and was the party in privity with it.  (*E.g.*, Am. Compl. ¶¶ 6, 16; Opp. at 6.)  The Agreement provided that CBRE would "[e]mploy, discharge, and supervise" all "contractors," with Subaru providing only "reimbursement" to CBRE.  (ECF 16-1, Agreement §§ 3(c), 5(a).)  Subaru paid some invoices directly, but only so that CBRE did not need to "advance its own funds for payment of [such] reimbursable expenses."  (*Id.* § 5(c).)  None of Plaintiffs' allegations adds up to "fraudulently induced contracts" between Subaru and Allied.

<u>Third</u>, and in all events, Plaintiffs' "fraudulent inducement" theory is contrary to the law.  Even where a plaintiff alleges fraudulent inducement (which is not true

7

here), the economic loss doctrine will bar the plaintiff's fraud claim if the alleged fraud "fall[s] within the subject matter of the [preexisting] contract." *Cudjoe*, 2019 WL 949301, at *4.  For example, in *Cudjoe*, a bank servicing a mortgage was alleged to have fraudulently induced the homeowner to sell to a third party, but even though the plaintiff entered into a new sales contract with the third party, the bank's alleged "misrepresentations still fell within the ambit of [its] performance under the *preexisting* mortgage agreement." *Id.* (emphasis added); *see also Masterank Wax*, 2020 WL 2744603, at *3 (fraudulent inducement exception requires "that the underlying misrepresentations [were] *unrelated* to the performance of the contract") (emphasis added).[1]   Here, approving contractors' invoices fell within the subject matter of the preexisting Agreement between CBRE and Subaru.

In sum, as this Court recently reiterated, "[t]he economic loss doctrine defines the boundary between overlapping theories of tort law and contract law by barring the recovery of purely economic losses in tort." *Id.*; *see also Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 248 (3d Cir. 2010) ("New Jersey courts have consistently held that contract law is better suited to resolve disputes between" sophisticated contracting parties).  Those principles bar Plaintiffs' tort claims here.

---

[1] Plaintiffs cite *Touristic Ents. Co. v. Trane, Inc.*, but in that decision, unlike here, the defendant asserting the economic loss doctrine (Trane) was not a party to the initial contract.  2009 WL 3818087, at *1-2 (D.N.J. Nov. 13, 2009).  Plaintiffs also argue at length about *Werwinski v. Ford Motor Co.,* 286 F.3d 661 (3d Cir. 2002), but CBRE did not cite that case, it simply noted that *Bracco* quotes from it.

## II.     The Limitation Of Liability Applies To Any Remaining Claims.

As CBRE also established, Plaintiffs' remaining claims are subject to the limitation of liability in Section 7(b)(iii).  (Mot. at 11-13.)  In response, Plaintiffs ignore their own contract-based claims, and instead argue that such clauses are not enforceable with respect to fraud.  (Opp. at 10-11, 13-15.)  This is misdirection. CBRE has not contended that Plaintiffs' fraud claim is subject to the limitation of liability.  Indeed, the entire purpose of Plaintiffs' tort claims is to seek remedies "beyond those embraced by the contract," which is not permitted under the economic loss doctrine.  *Montclair*, 2012 WL 3647427, at *10 (internal quotations omitted).

Stripped of strawmen, Plaintiffs are left to contend:  (a) their contract claims are not subject to a provision covering "*defaults*"; and (b) their first-party claims against CBRE are covered by indemnification.  Both arguments fail.

### A.     Section 7 Unambiguously Applies To Plaintiffs' Remaining Claims.

Plaintiffs first argue that they have not alleged a "Default" under the parties' Agreement, but this is obviously wrong.  (*See* Opp. at 9-11.)  Section 7(a) defines "Defaults."  (ECF 16-1, Agreement at 9.)  The first two sub-provisions deal with specific types of breaches: (i) a failure to "pay monies" and (ii) false "representation[s]" contained in the contract.  (*Id.* § 7(a)(i) & (ii).)  The third sub-provision covers *every other contractual breach*, excluding only the types covered by the other sub-provisions.  (*Id.* § 7(a)(iii).)  A "Default" is defined broadly as:

> Failure in **any respect** *of a party to perform as required by this agreement*, except for payment of monies when due, or failure in any respect of a party to observe any covenant, condition, or agreement required by this Agreement to be performed by it and such failure is not cured within thirty days (30) after receipt of written notice thereof from the other party.

(*Id.*, emphasis added.)

There can be no serious argument that Plaintiffs' Counts I & II do not allege a "Default" as specified in Section 7(a)(iii).  Plaintiffs' Count I alleges: "Plaintiffs have been damaged as a result of the *failure by CBRE to provide facilities management services according to the terms of the Agreement* in an amount of not less than $9,700,000."  (Am. Compl. ¶ 30, emphasis added.)  Count II similarly alleges that CBRE failed to observe the covenant of good faith "implied in [the] contract."  (*Id.* ¶ 32, 34.)  Plaintiffs' unexplained suggestion (Opp. at 10) that there is something "vague" about Section 7(a)(iii) is baffling—they have alleged claims that match Section 7(a)(iii)'s definition of "Default" almost word-for-word. Plaintiffs' arguments about "gross negligence and fraud" (*e.g., id.* at 11) are off-point because Counts I and II are contract claims.

Having alleged "Defaults" under the Agreement, Plaintiffs' non-fraud claims are unambiguously subject to the limitation of liability provision in Section 7(b)(iii). Plaintiffs do not argue that there is anything "vague" in Section 7(b)(iii), nor could they.  That provision plainly states that, following the occurrence of a Default,

CBRE's liability to Subaru "for ***any and all damages*** shall be limited to the least of" the listed measurements. (ECF 16-1, Agreement § 7(b)(iii), emphasis added.) Plaintiffs do not deny, as CBRE suggested (Mot. at 12), that the parties themselves can determine which measurement applies if the Court holds that Plaintiffs' claims are subject to Section 7(b)(iii).

Plaintiffs' only contrary argument is that a purported "carve out" in Section 7(b)(iii) allows Subaru to purse "any other . . . right specifically permitted by [the] Agreement." (Opp. at 5.) But the only "other right" Plaintiffs identify is indemnification. (*Id*.) As shown next, Plaintiffs do not and cannot allege an indemnification claim. Thus, as a matter of law, Section 7(b)(iii) applies.

### B.   Plaintiffs Have Not Alleged Indemnification Against CBRE.

Plaintiffs' only attempted escape hatch from Section 7(b)(iii) is indemnification under Section 8(b), but Plaintiffs themselves recognize the fatal problem with that argument by citing the Third Circuit's decision in *Travelers*, 594 F.3d 238, which forecloses it. As Plaintiffs admit, Section 8(b) is an indemnification provision. (Opp. at 1, 8.) It contains two sentences, which Plaintiffs quote in snippets, but each of those sentences begins with the unambiguous terms that CBRE shall "indemnify, defend, and hold harmless" Subaru from the occurrences listed thereafter. (ECF 16-1, Agreement §8(b).) Other than "indemnify[ing], defend[ing], and hold[ing] harmless," Section 8(b) contains no other duties for CBRE.

That narrow function is dispositive, because the Third Circuit and New Jersey courts alike have held that a duty to "indemnify, defend, and hold harmless," by its terms, can only apply to *third-party liability* asserted against the indemnitee, not *first-party* liability asserted by one contractual party against the other.  In *Travelers*, the Third Circuit interpreted the same terms "defend, indemnify, and hold harmless," and held that, under the "plain language" of those words, "the only sensible reading of [the] clause evidences a requirement that *third-party liability* exist for the clause to be triggered."  594 F.3d at 255 (emphasis added).  That is because, under New Jersey law, "an indemnification claim is viable only where the indemnitee seeks to obtain recovery from the indemnitor for *liability incurred to a third party*."  *Id.* at 254 (internal quotations omitted, emphasis added).  Thus, a claim for "first-party damages" asserted as indemnification "fails as a matter of law."  *Id.* at 255.

New Jersey courts have likewise held that "[i]t is axiomatic . . . that an indemnification agreement must be based upon the indemnitee's claim to obtain recovery from the indemnitor for *liability incurred to a third party*."  *Investors Savings Bank v. Waldo Jersey City, LLC*, 12 A.3d 264, 270 (N.J. Super. Ct. App. Div.2011) (emphasis added).  A provision requiring one party to "indemnify, defend, and hold harmless" the other party thus "has no application" to claims between the two contractual parties.  *Id.* at 270-71 & n.6.  And in *Atlantic City Assocs. LLC, v. Carter & Burgess Consultants, Inc.*, 453 F. App'x 174, 180 (3d Cir. 2011), a case

12

that originated in this Court, the Third Circuit held that New Jersey law "foreclosed any such argument" that "indemnification clauses might apply to first-party disputes between parties to a contract." In so holding, the Third Circuit rejected the argument, like the argument Plaintiffs make here, that an indemnification clause was in "conflict" with a limitation of liability provision. *Id.* at 180-81.

Those authorities spell the end of Plaintiffs' indemnification theory here. As in *Atlantic City*, Plaintiffs "never pleaded the theory that they [were] seeking indemnification for third-party losses" pursuant to Section 8(b), which alone is fatal. *Id.* at 181.[2] Instead, all of Plaintiffs' claims against CBRE are *first-party* claims— *i.e.*, CBRE allegedly injured *Subaru*, not a third party, because it allegedly breached its Agreement *with Subaru* (Counts I & II) or made misrepresentations *to Subaru* (Counts III & IV). Those are classic "first-party dispute[s] between parties to the contract." *Atl. City*, 453 F. App'x at 181.

Plaintiffs nonetheless argue for the first time that Subaru "<u>is</u> seeking to be indemnified" against "claims and demands" in the form of Allied's false invoices. (Opp. at 12.) This new theory, which is nowhere to be found in Plaintiffs' pleading, is contrary to law. In New Jersey, "indemnity is a right which enures to a person

---

[2] Count V, for "Contribution/Indemnification," is not alleged pursuant to Section 8(b) or on behalf of Subaru, but instead concerns Great American's alleged losses because it paid Subaru's insurance claim. As discussed in the next section, there is no legal basis for a claim for indemnification by Great American against CBRE.

who, without active fault on his own part, has been *compelled*, by reason [of] some *legal obligation*, to pay *damages* occasioned by the initial negligence of another[.]" *Travelers*, 594 F.3d at 258 (*quoting Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 159 A.2d 97, 110 (1960) (emphasis added)).  Here, there is no third-party injury or damages alleged on the part of Allied caused by CBRE, a necessary predicate for indemnification.[3]  Moreover, the entire point of Plaintiffs' claims is that Subaru was *not* liable to reimburse Allied's invoices, because they were fraudulent, but paid only because of alleged fraud by CBRE.  Plaintiffs' theory thus lacks the required element of a "legal obligation" by Subaru to pay the underlying claim.[4]

Plaintiffs sum it up best:  "Subaru is seeking reimbursement for damages *it sustained* when it made payments to [Allied] *by reason of CBRE's fraudulent acts*."  (Opp. at 13, emphasis added.)  In other words, Subaru (not a third party) sustained damages because Subaru (not a third party) was the subject of a fraud by its direct

---

[3] *See e.g.*, *Kornblith v. Rothe*, 1991 WL 7674, at *3 (D.N.J. Jan. 23, 1991) ("indemnity rests upon a difference between the primary and secondary liability of two persons, each of whom is made responsible under the law to an ***injured party***.") (emphasis added); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 552 F.Supp.2d 515, 521 (E.D. Pa. 2008) (New Jersey and Pennsylvania law: "[h]owever [indemnity] is formed, the relation requires passive or secondary liability in the indemnitor to an ***injured third party***.") (emphasis added).

[4] *See, e.g., Atl. City*, 453 F. App'x at 181 ("[i]t is only when the indemnitee is ***found liable to a third party*** that the indemnification agreement may be triggered"); *Travelers*, 594 F.3d at 255 (indemnification clause "require[s] that ***third-party liability exist*** for the clause to be triggered.") (emphasis added).

counterparty.  Indemnity does not apply to those first-party claims.  Plaintiffs cannot avoid the limitation of liability.

## III.   Count V Should Be Dismissed.

Finally, Great American's Count V for "contribution/indemnification" should be dismissed because it lacks any legal basis.  (Mot. at 14.)  In response, Plaintiffs do not attempt to defend this claim except to say that Great American may "step into the shoes" of Subaru through subrogation and seek "indemnification for the same reasons [as] Subaru."  (Opp. at 21.)  Count V, however, concerns Great American's alleged losses, not Subaru's.  (*See* Am. Compl. ¶¶ 50-54.)  Further, Great American has already asserted a claim for subrogation in Count VI, rendering this theory duplicative, at best.  In all events, as shown, Subaru is not entitled to indemnification.

## <u>Conclusion</u>

WHEREFORE, CBRE respectfully requests that the Court order: (1) Plaintiffs' tort claims (Counts III & IV) are barred by the economic loss doctrine and are dismissed with prejudice; (2) Counts I, II and VI are subject to the parties' limitation of liability provision in the Agreement; (3) Count V is dismissed with prejudice; and (4) such other relief as the Court may deem equitable and just.

Dated:  January 12, 2021                    CBRE, INC.

By:  */s/ Andrew J. Lichtman*
                                                    One of Its Attorneys

Andrew A. Weissmann (admitted *pro hac vice*)
Andrew J. Lichtman
JENNER & BLOCK LLP
919 Third Avenue
New York, New York 10022
(212) 891-1600 phone
(212) 891-1699 fax
aweissmann@jenner.com
alichtman@jenner.com

Daniel J. Weiss (admitted *pro hac vice*)
Keri L. Holleb Hotaling (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654
(312) 222-9350 phone
(312) 527-0484 fax
dweiss@jenner.com
khotaling@jenner.com

### Certificate of Service

I, Andrew J. Lichtman, hereby state that I caused the foregoing document to be filed on the Court's ECF system on January 12, 2021, which caused a copy to be served upon all counsel that have appeared in this matter.


Dated:  January 12, 2021                   By:  /s/ *Andrew J. Lichtman*_____